## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EHSAN MOHAMAD OUZA,

          Plaintiff,

   v.

CITY OF DEARBORN
HEIGHTS, and JORDAN
DOTTOR and GENE DER-
WICK, in their individual and
official capacities,

          Defendants.

Case No. 16-14331
Hon. Terrence G. Berg

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

Plaintiff brought suit pursuant to 42 U.S.C. § 1983 alleging that the city of Dearborn Heights and two individual police officers, Jordan Dottor and Gene Derwick, violated her constitutional rights by arresting her after an incident of alleged domestic violence. This matter comes before the Court on Defendants' Motion for Summary Judgment. ECF No. 26.

For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

1

## II.    Background

The events giving rise to this dispute took place on December 18, 2014 at Ehsan M. Ouza's (Plaintiff's) home in Dearborn Heights, Michigan. ECF No. 1 PageID.3. According to the deposition of Plaintiff's daughter, Maysaa Ouza, at approximately 8:00 a.m., Plaintiff's son, Hassan Ouza, appeared under the influence of drugs or alcohol and attempted to drive Maysaa's car. ECF No. 29-3 PageID.342. Maysaa refused to allow Hassan to drive, and a verbal altercation ensued. *Id.* During the incident, Maysaa placed a call to her father, Plaintiff's ex-husband, Mohammad Ouza, in order to have Mohammad help her convince Hassan that he was not fit to operate a vehicle. *Id.* Instead, Mohammad told Maysaa that she *should* let Hassan take her car. *Id.* In the meantime, Hassan and his mother Ehsan's altercation had become physical; Hassan pushed a wardrobe over on top of Ehsan. *Id.* Maysaa said she planned to call the police and at that point Mohammad showed up at the door.  Mohammad then took Maysaa's and Ehsan's cell phones. *Id.* Prior to December 18, 2014, Plaintiff obtained a Personal Protection Order (PPO) against Mohammad, which was still in effect on that date. ECF No. 1 PageID.4.

The record is unclear as to whether Maysaa called the police for the first time before or after her father arrived, but the police report

indicates that at 8:01 a.m., Defendant Officer Dottor was dispatched to the home to respond to the family trouble call. ECF No. 26-4 PageID.181. Hassan and Mohammad were no longer present when Dottor arrived. *Id*. PageID.183. Officer Dottor gave Ehsan and Maysaa a crime victim's rights card and left the scene. *Id*.

Soon after Officer Dottor left Plaintiff's house, Mohammad returned with the cell phones he had taken earlier. ECF No. 29-3 PageID.342. When Maysaa opened the door a crack in order to retrieve the phones, Mohammad pushed his way inside. *Id*. At this point, there was a physical altercation between Plaintiff and Mohammad during which Mohammad pinned Plaintiff to the floor. *Id*. During this time, according to Plaintiff, she "tapped" Mohammad with a broken hanger in an attempt to break his hold on her. *Id*. Maysaa stepped in and successfully pulled Mohammad off Plaintiff; she then called the police a second time. *Id*. PageID.344–45. Officer Dottor was dispatched to the house again at 9:54 a.m. ECF No. 26 PageID.115.

Upon arriving at Plaintiff's house for the second time, Dottor first spoke with Mohammad, who was standing outside the house. Mohammad told Officer Dottor that he stayed at the house after the previous incident with Hassan to gather some clothes and that Plaintiff had attacked him. ECF No. 29 PageID.295. Inside the house, Dottor spoke with Plaintiff and Maysaa, who told him that

Mohammad "trespassed, attacked [Ehsan], put her on the floor, and was above her." ECF No. 26 PageID.116. Both Plaintiff and Maysaa told Dottor that Plaintiff had acted in self-defense after Mohammad attacked her. *Id*. Officer Dottor nonetheless placed Plaintiff under arrest. ECF No. 29 PageID.295. As Dottor was taking Plaintiff outside past Mohammad, he stated "What are you guys doing? I was trespassing. I hit her. Take me instead. She was just defending herself. What are you doing?" *Id*. PageID.296.

The witnesses present conflicting versions of the facts. Plaintiff posits that Mohammad had no injuries, ECF No. 29 PageID.297; Defendants claim that Mohammad had a cut or scratch on his face that was photographed at the scene. ECF No. 26 PageID.117. Plaintiff states that she told Officer Dottor that the handcuffs were too tight and were hurting her, ECF No. 26 PageID.118, while Defendants state that a different police officer, Defendant Officer Derwick, was the one who transported Plaintiff to the police station. *Id*. At their depositions, neither officer could recall Plaintiff asking them to loosen the handcuffs. ECF No. 26-6 PageID.204–05; ECF No. 26-8 PageID.230. Plaintiff states that she had red marks on her wrists when she was released from jail the next day. ECF No. 29 PageID.297. She also underwent treatment for carpal tunnel syndrome approximately three months after the arrest. *Id*. at PageID.298. Defendants maintain that the carpal tunnel was a

preexisting injury, not caused by the handcuffs. ECF No. 30 PageID.485.

Officer Derwick testified that his vehicle had a dashcam and a microphone in the backseat, and that he was wearing a body microphone, all of which were working on the day of the incident. ECF No. 26-8 PageID.225. These recordings were destroyed and no defendant has explained why. ECF No. 29 PageID.314. Officer Stephen Popp, the evidence technician at the scene, testified that he gathered photos of Mohammad's injuries. ECF No. 29-6 PageID.386–87. Again, the photos are missing with no explanation of their absence. *Id.* at PageID.385.

### III. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

As the moving party, the Defendant has the initial burden to show that there is an absence of evidence to support Plaintiff's case. *Selby v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552. Since Defendants' motion rests in part on a claim of qualified immunity, Plaintiff bears the burden of showing that Defendants are not entitled to such immunity under the test established in *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) in order to survive a motion for summary judgment. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

The *Harlow* test has two prongs. Under the first, the Court must determine whether the officer's conduct violated a federal right. The Court must also determine whether that right was "clearly established" at the time, such that a reasonable official would have known of it. 457 U.S. at 818. However, even when a defendant asserts qualified immunity as an affirmative defense in a motion for

summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255).

## IV. Analysis

Plaintiff's Complaint contains four allegations. First, Plaintiff alleges claims against Officer Jordan Dottor for unconstitutional arrest and search and seizure. Plaintiff next alleges claims against Dottor and Officer Gene Derwick (consolidated with this case from a separate lawsuit she filed against him) for excessive force. Finally, Plaintiff alleges municipal liability against the City of Dearborn Heights for failure to train and supervise its police officers. Plaintiff also raises a spoliation claim, requesting an adverse inference against Defendants based on the fact that video and audio evidence from the incident is missing or destroyed. The Court considers each of these claims in turn below in accordance with the above-referenced summary judgment standard.

### a. Spoliation

The disposition of Defendants' motion depends in part on the outcome of Plaintiff's spoliation claim. Consequently, the Court considers this claim first. Federal law applies to spoliation sanctions in federal litigation. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir.

2009). In this case, Plaintiffs have requested an adverse inference as the remedy, arguing that because Defendants should have preserved the audio recordings and photographs but failed to do so, the Court ought to assume that this evidence would have been unfavorable to Defendants. ECF No. 29 at PageID.313–14.

> [A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

### i. Obligation to preserve

"An obligation to preserve may arise 'when a party should have known that the evidence may be relevant to future litigation.'" *Beaven*, 622 F.3d at 553 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). In this case, Defendants undisputedly had control over the audio recordings and photographs. And Defendants

should have known that the evidence may be relevant to future litigation—it was evidence collected in a criminal case. During oral argument on this motion, counsel for Defendants noted that the prosecutor's office declined to prosecute Plaintiff, perhaps explaining the destruction of evidence. But at the same time, Defendants are unable to provide even a paper trail of the evidence, which would almost certainly exist had the evidence been destroyed in accordance with policy triggered when the prosecutor's office decides not to prosecute. Defendants therefore had an obligation to preserve the evidence that is not discharged because of the decision not to prosecute Plaintiff.

### ii. Culpable state of mind

In *Jackson v. Target Corporation*, No. 12-12190, 2013 U.S. Dist. LEXIS 100340, at *20 (E.D. Mich. Jul. 18, 2013), the court found that a party can have a "culpable state of mind" when it "deliberately *or* accidentally loses or destroys material evidence, or fails to preserve it when the party should know they are under a duty to preserve." (emphasis in original). Similarly, the Sixth Circuit has concluded that "[a]n adverse inference for evidence spoliation is appropriate if the defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or de-

struction." *Carlson v. Fewins*, 801 F.3d 668, 678 (6th Cir. 2015) (internal citations and brackets omitted); *see also Beaven*, 622 F.3d at 554 ("The culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or *negligently*." (citations and internal quotation marks omitted)).[1]

In this case, Defendants have not provided any information—in their briefing or at oral argument—about why this evidence is missing. By all accounts, it ought to have been preserved. Without an explanation as to why it was not, the Court must conclude that Defendants acted negligently at the very least.

---

[1] There is some out-of-circuit precedent that indicates a different standard for the culpable state of mind issue when spoliation is raised in a response to a motion for summary judgment. For example, the Third Circuit stated that in such cases there must be actual evidence that the alleged spoliation was intentional and driven by a desire to suppress the truth. *Davis v. Quaker Valley School District*, 693 Fed. Appx. 131, 135 (3d Cir. 2017). The Eighth Circuit said the same in *Johnson v. Securitas Security Services*, 769 F.3d 605 (2014) which considered a spoliation argument made in response to a motion for summary judgment. Finally, the Seventh Circuit concluded that the district court correctly granted the defendant's motion for summary judgment without granting an adverse inference to the plaintiff where the plaintiff failed to show that evidence was intentionally destroyed in bad faith. *Flournoy v. Schomig*, 418 Fed. Appx. 528 (7th Cir. 2011). But because the Court is not granting an adverse inference at this time, it does not decide the issue of culpable state of mind here.

### iii. Relevance

Defendants admit that the allegedly spoliated evidence is what would best prove or refute Plaintiff's claims. ECF No. 29-6 PageID.387. The photographs of Mohammad's alleged injuries would aid in determining whether Officer Dottor had probable cause to arrest Plaintiff. The audio recording from the backseat of Officer Derwick's car would show whether Plaintiff asked him to loosen the handcuffs, which is a central question in Plaintiff's excessive force claim.

### iv. Remedy

District courts have a wide berth to fashion appropriate remedies for spoliation of evidence. "[A] proper spoliation sanction should serve both fairness and punitive functions, but its severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances." *Beaven*, 622 F.3d at 554. "A district court may impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070 (6th Cir. 2014) (citation and internal quotation marks omitted). Defend-

ants' spoliation creates questions of material fact where those questions may not otherwise exist. Consequently, Defendants' spoliation makes their Motion for Summary Judgment weaker on those points, as discussed below. Given that the lack of evidence generally disadvantages Defendants in this motion, the Court finds it unnecessary to adopt an adverse inference at this time. Should this case proceed to trial, however, the Court will address the adverse inference remedy again at that time.

### b. Section 1983 and Qualified Immunity

Under *Harlow*, police officers are entitled to immunity from civil suit unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known. 457 U.S. at 818. In order to survive a motion for summary judgment in which a defendant claims that he is entitled to qualified immunity, a plaintiff bears the burden of showing that the *Harlow* test is satisfied. The Court examines each of Plaintiff's three claims below to determine whether Plaintiff has shown that Defendants Dottor and Derwick are not entitled to qualified immunity.

### i. False arrest (Officer Dottor)

Under the *Harlow* test, Plaintiff survives summary judgment on this claim if (1) Officer Dottor violated her federal right; and (2) the right violated was clearly established such that a reasonable officer would have known of it. The Court has discretion to determine the order in which it considers these two prongs. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

*Violation of a federal right*

An arrest violates a person's constitutional right if there was no probable cause for the arrest. *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). "An officer possesses probable cause when, at the moment the officer seeks the arrest,[2] the facts and circumstances within the officer's knowledge and of which she had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (citing *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964) (internal quotation marks and brackets omitted)).

Once probable cause has been established, the police have no further obligation to seek or investigate exculpatory evidence. *Ahlers*

---

[2] Defendants are correct that the standard for probable cause does not permit the Court to consider Mohammad's statements to officers after they had already arrested Plaintiff.

*v. Schebil*, 188 F.3d 365, 370–71 (6th Cir. 1999). However, "an officer cannot simply turn a blind eye toward evidence favorable to the accused or ignore information which becomes available in the course of routine investigations." *Wesley*, 779 F.3d at 429 (internal citations and quotation marks omitted). Therefore, in order to prevail on their motion for summary judgment, Plaintiff must show that, taking all reasonable inferences in her favor, Mohammad's conversation with Officer Dottor prior to Dottor entering the home (1) did not independently establish probable cause; and (2) Officer Dottor "turn[ed] a blind eye" toward exculpatory evidence in his interviews with Plaintiff and Maysaa that occurred prior to Plaintiff's arrest.

First, in this case, the conversation with Mohammad alone is insufficient to establish probable cause. Sixth Circuit case law grants a "presumption of reliability for eyewitness allegations" sufficient to establish probable cause "only where the witness is 'someone with respect to whom there is *no* apparent reason to question the person's reliability.'" *Wesley*, 779 F.3d at 429–30 (quoting *Logsdon v. Hains*, 429 F.3d 334, 343 (6th Cir. 2007) (emphasis in *Wesley* only)). Officer Dottor had reason to question Mohammad's reliability, because Mohammad's inculpation of Plaintiff was also his own exculpation. Indeed, Officer Dottor was in a position to know that Mohammad was being untruthful, at least regarding some of the

facts—Mohammad said that he stayed at the house after the incident with Hassan, but Officer Dottor wrote in his report from the first incident that Hassan and Mohammad were *not* at the house when he arrived. ECF No. 26-4 PageID.181. Mohammad's statement contradicts what Officer Dottor wrote in his own report from his first dispatch to Plaintiff's house. The pre-entry conversation between Officer Dottor and Mohammad was therefore not sufficient by itself to establish probable cause to arrest Plaintiff.

"[L]aw enforcement is under no obligation to give any credence to a suspect's story or alibi nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) (internal quotation marks omitted). But in this case, as noted above, the facts as initially discovered were ambivalent. Consequently, Officer Dottor cannot rely on the *Ahlers* rule to excuse him from taking into account exculpatory information discovered inside the house during his conversation with Plaintiff and Maysaa.

Officer Dottor also cites to the presence of Mohammad's alleged injury as a factor that established probable cause before Officer Dottor entered the house. ECF No. 30 at PageID.483. But the existence of this injury is disputed by Plaintiff, and due to Defendants' own loss or destruction of evidence, there is no physical evidence

showing that the injury existed. At the same time however, Plaintiff did admit that she "tapped" Mohammad with a plastic hanger, providing some support for Officer Dottor's report of an injury. The question is a close one—while the summary judgment standard requires that the Court adopt all reasonable inferences in the light most favorable to Plaintiff, the probable cause standard requires the Court to consider the facts known to the officer at the time of arrest.

Each fact Officer Dottor claims he gathered from Mohammad prior to entering the house is counterbalanced in the record by a fact to which Plaintiff or her witnesses have testified. Officer Dottor testified that Mohammad stated that Plaintiff attacked him, ECF No. 29-12 PageID.430; Maysaa testified that when she called the police for the second time that morning, she told them, "My dad is hitting my mom, please come fast." ECF No. 29-3 PageID.345. Officer Dottor claims to have seen a cut on Mohammad's face, ECF No. 29-12 PageID.430; Maysaa testified that her father's face was unmarred. ECF No. 29-3 PageID.350. Officer Dottor testified that Plaintiff could not explain how or why Mohammad attacked her; Maysaa testified that she was there while Plaintiff spoke to Officer Dottor, and that Plaintiff *did* explain the details of the attack. 29-3 PageID.350.

Ultimately, if the jury were to resolve all disputed facts in Plaintiff's favor, it *could* conclude there was insufficient probable cause to arrest Plaintiff. However, as discussed in the next section, the right violated is not so clearly established that any violation of it defeats qualified immunity.

### *Whether the right was clearly established*

Having determined that a jury could conclude that Officer Dottor violated Plaintiff's right to be free from arrest without probable cause, the Court now turns to whether the right that Officer Dottor violated was "clearly established."[3] The Supreme Court has written that a primary touchstone of the clearly established law analysis in the Fourth Amendment context is whether there is an existing case where an officer "acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 551. In other words, "the relevant inquiry is whether existing precedent placed the conclusion that the defendant violated the law in these circumstances beyond debate." *Smith v. City of Wyoming*, 821 F.3d

---

[3] An officer's action can violate the Fourth Amendment's requirement of an objectively reasonable belief that probable cause exists, while not violating qualified immunity's requirement that a reasonable officer be aware of a clearly established right. *Cf. Malley v. Briggs*, 475 U.S. 335, 344 (1986). To determine whether a right is so clearly established that no reasonable officer would be unaware of it, the Court must examine whether the mistake made— violating Plaintiff's constitutional right—was a reasonable one given the facts and circumstances of the arrest. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017).

697, 709 (6th Cir. 2016) (internal quotation marks and citations omitted).

As noted above, the Sixth Circuit allows a "presumption of reliability for eyewitness allegations" sufficient to establish probable cause "only where the witness is 'someone with respect to whom there is *no* apparent reason to question the person's reliability.'" *Wesley*, 779 F.3d at 429–30 (quoting *Logsdon*, 429 F.3d at 343 (emphasis in *Wesley* only)). The Court has already pointed out that there is evidence showing that Officer Dottor ran afoul of this rule. The remaining question is whether this rule about reliability of eyewitnesses bearing on probable cause is "clearly established," and whether, in this case, given the totality of the circumstances, no reasonable officer would have acted as Officer Dottor did. The Court finds that the right violated is *not* clearly established because the cases that define it are in tension and because the standard for judging reliability requires weighing several factors against each other.

The Supreme Court has cautioned against defining a right at a high level of generality. *See, e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). If the Court were to define the right Defendant violated as "the right to be free from unlawful seizure," the conclusion is obvious that this right is clearly established. "But if the test of

'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*." *Id.* The Supreme Court has stated several times that it is particularly important to define a right with specificity in the Fourth Amendment context. *E.g.*, *City of Escondido, Cal. v. Emmons*, -- S.Ct. ---, 2019 WL 113027, at \*2 (Jan. 7, 2019). Indeed, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* The Court therefore considers whether there is a clearly established right to be free from the type of arrest Plaintiff experienced: arrest based on the testimony of one eyewitness who has an apparent bias in the matter.[4]

The Sixth Circuit has considered this issue in several cases. First, the Circuit found that "[a]n eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d at 370 (internal quotation marks omitted). In addition, "victims and eyewitnesses of crimes

---

[4] Because the summary judgment standard indicates that "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Tolan*, 572 U.S. at 651, the Court credits Maysaa's testimony that her father's face did not have any marks over Defendant's report stating that he had a cut on his face.

are entitled to a presumption of reliability and veracity without independent corroboration." *United States v. Ingram*, 985 F.2d 562 (unpublished table decision), 1993 WL 5914, at *2 (6th Cir. Jan. 13, 1993). Still, the case that the Court found helpful on the matter of whether Defendant violated Plaintiff's right, *Wesley*—quoted several times already—states that the presumption applies only where there is no reason to question the eyewitness' reliability. 779 F.3d at 429–30. Here, Mohammad was allegedly the victim of a crime— Officer Dottor's report states that Mohammad told Officer Dottor that Plaintiff had attacked him. Yet the record also showed there was an apparent reason—perhaps several reasons—to question Mohammad's reliability, though nothing clearly suggests that Mohammad was lying about being attacked.

Under these circumstances, Officer Dottor's decision to rely on Mohammad's eyewitness account, together with his observation of the cut on his face, was not objectively unreasonable. The case law outlined above regarding eyewitness accounts establishing probable cause does not place it "beyond debate"[5] that Mohammad's account could establish probable cause for an arrest. *Provience v. City of Detroit*, 529 F. App'x 661, 667 (6th Cir. 2013) (noting that the burden on the plaintiff to defeat qualified immunity is "to show that no reasonable officer would have concluded, under the totality of

---

[5] *Smith*, 821 F.3d at 709.

the circumstances, that probable cause to arrest existed"). The Court finds that Officer Dottor is entitled to qualified immunity on Plaintiff's claim for false arrest.

### ii. Search and seizure (Officer Dottor)

Defendants contend that summary judgment in their favor is warranted on Plaintiff's claim of unconstitutional search and seizure. Defendants maintain that Officer Dottor had been given consent to enter the home and, in the alternative, that exigent circumstances existed justifying entering the home. ECF No. 26 PageID.123–27. In response, Plaintiff concedes that she did not claim that Officer Dottor entered her home illegally, ECF No. 29 PageID.303 n.1, but Plaintiff's Complaint nonetheless alleged that "Defendant acted unreasonably and failed in his duties when he unlawfully entered Plaintiff's residence. . ." ECF No. 1 PageID.6. A review of the evidence here demonstrates that Defendants are entitled to summary judgment on this claim. The parties agree that someone in the house summoned the police and that Officer Dottor had express or implied consent to enter the home. Under these circumstances, Dottor's entry into the home was lawful. *See Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016). No reasonable jury could find otherwise.

### iii. Excessive force (Officers Dottor and Derwick)

*Violation of a federal right*

Defendants acknowledge that "The Fourth Amendment . . . prohibits unduly tight handcuffing in the course of an arrest." ECF No. 26 PageID.129 (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005)). In order to avoid summary judgment based on qualified immunity on a claim of excessive force due to tight handcuffing, a plaintiff must show "(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Morrison v. Bd. of Trustees of Green Township*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Lyons*, 417 F.3d at 575–76 (6th Cir. 2005)).

Plaintiff has alleged that she complained multiple times that the handcuffs were too tight around her wrists. ECF No. 29-2 PageID.328. She also alleges that, despite her complaints, Officer Derwick did not check or loosen the handcuffs. *Id.* Officer Derwick stated that he would have stopped to check the tightness of the cuffs in response to a complaint about tightness if he was a significant distance away from the police station. ECF No. 29-5 PageID.381. But he has no independent recollection of the incident. *Id.* at PageID.375. Defendants offer no evidence that Officer Derwick or

Officer Dottor ever checked the handcuffs—nor is there any evidence, beyond Plaintiff's testimony—that they did *not* check the handcuffs. Therefore, as to the first two prongs of the tight handcuffing test, there is a genuine issue of material fact at the very least. Because the officers state that they have no present recollection of any issue arising regarding the handcuffing of Plaintiff, the record consists essentially of uncontroverted evidence that Plaintiff complained about tight handcuffs and was ignored.

As to the third prong, the question is more difficult. Plaintiff has alleged "some physical injury" in two ways: the red marks shown in the photograph taken after her release from jail, ECF No. 29-15, and the medical records showing that approximately two months after her arrest she saw a doctor for diagnosis and treatment of carpal tunnel syndrome. ECF No. 29-14.

Plaintiff has alleged that the handcuffs caused her carpal tunnel syndrome. However, she has also admitted that she suffered hand numbness and tingling *prior* to her arrest, stemming from an automobile accident in the late 1990s. ECF No. 29 PageID.311. Plaintiff contends that the unduly tight handcuffs exacerbated her prior injury. *Id.* However, Plaintiff's medical records from only one month after her arrest state that there is "[n]o evidence of fracture, erosive change, or significant degenerative change in either the right or left

wrist." ECF No. 26-13 PageID.257. This does not necessarily preclude the conclusion that the handcuffs exacerbated a preexisting feeling of numbness and tingling. But a subjective assessment of pain or numbness "does not amount to evidence of 'physical injury.'" *Jackson*, 657 Fed. Appx. at 501 (quoting *Getz v. Swoap*, 833 F.3d 646, 653–54 (6th Cir. 2016) (affirming a grant of summary judgment in a tight handcuffing case because there was no evidence that there was a causal connection between the tight handcuffs and the diagnosis of carpal tunnel syndrome)). Although Plaintiff's case is narrowly distinguishable from *Jackson* because she was not diagnosed with carpal tunnel syndrome until after the arrest—unlike the plaintiff in *Jackson*, who got his diagnosis prior to his arrest— the causation question remains. Plaintiff's medical examination shortly after the handcuffing occurred showed an absence of any injury to her wrists. This severs any causal link between the handcuffing and the later diagnosis of carpel tunnel syndrome. That condition may have resulted from some later physical injury, but no additional injury—beyond what she had already complained of prior to the arrest—was found to have existed to Plaintiff's wrists shortly after the incident. Therefore, Plaintiff cannot rely upon her carpal tunnel diagnosis to show that she suffered some physical injury from the handcuffs.

Second, Plaintiff provides several photos that show faint red marks on her wrists that were taken the day after her arrest. In *Morrison*, the Sixth Circuit rejected the contention that "bruising and wrist marks alone are, as a matter of law, insufficient to establish physical injury" for a tight handcuffing claim. 583 F.3d at 402. But *Morrison* relied on cases in which arrestees suffered numbness, swelling, pinched skin that bled, and hands that turned blue while handcuffed. *E.g.*, *Martin v. Heideman*, 106 F.3d 1308, 1310 (6th Cir. 1997); *Baskin v. Smith*, 50 F. App'x 731, 737–338 (6th Cir. 2002); *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002). The evidence Plaintiff provides falls short of these injuries. But in *Al-Lamadani v. Lang*, 624 F. App'x 405, 413 (6th Cir. 2015), the Sixth Circuit found that there was a genuine question as to whether tight handcuffs caused some physical injury where the cuffs "left a red mark on [the arrestee's] left wrist that turned blue and was gone the next day." The description of the injury on the arrestee in *Al-Lamadani* sounds similar to Plaintiff's injury here. But *Al-Lamadani* also appears to conflict with *Smith v. Athens County*, 79 F. App'x 841, 843 (6th Cir. 2003), in which the Sixth Circuit affirmed the district court's grant of summary judgment through qualified immunity on an excessive force claim where the record showed that the plaintiff had red marks around his wrists from handcuffs.

In *Al-Lamadani*, the evidence of injury was found sufficient where it showed that the plaintiff's left wrist had a red mark that turned blue and was *gone* the next day. In *Smith*, the evidence was only that plaintiff had red marks and elevated heart rate when taken to the hospital at the time of the arrest.  This was not found to be sufficient to prove injury. Here, Plaintiff's wrists still bore some red marks that can plainly be seen in photographs taken the day after the arrest. Based on the case law, although the question is a close one, the Court finds that a reasonable jury could view the photographs showing some redness around Plaintiff's wrists on the day after the arrest, and conclude there was some physical injury, and that, consequently, Officer Dottor violated Plaintiff's right to be free from excessive force.

### Whether the right was clearly established

The Sixth Circuit has repeatedly held that "freedom from excessively forceful or unduly tight handcuffing is a clearly established right for purposes of qualified immunity." *Courtright v. City of Battle Creek*, 839 F.3d 513, 519 (6th Cir. 2016). The factual scenario in Plaintiff's case does not differ markedly from the bulk of cases cited in the previous section affirming the right to be free from excessively forceful handcuffing. In addition, there is no ambiguity in the case law with respect to the test for whether a person's Fourth

Amendment rights have been violated by excessively tight handcuffing. Therefore, any reasonable officer would have known that he was violating Plaintiff's right given the facts viewed in the light most favorable to Plaintiff.

Based on the foregoing, Defendant's motion for summary judgment on the claim of excessive force must be denied.

### c. Municipal Liability for Failure to Train and Supervise

A municipality may be held liable under 42 U.S.C. § 1983 if "the municipality *itself* causes the constitutional violation at issue." *Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978)). In order to establish a claim of this nature, Plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [her] particular injury was incurred due to the execution of that policy." *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 404 (6th Cir. 2010). Plaintiff has raised two claims against the City of Dearborn Heights under § 1983: failure to train police officers with respect to establishing probable cause for arrests and failure to supervise those officers.

### i. Failure to train

"Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 390. To establish liability for a failure to train, Plaintiff "must show prior instances of unconstitutional conduct demonstrating that the [City of Dearborn Heights] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).

In this case, Plaintiff alleges that Dearborn Heights unlawfully failed to train its police officers on proper use of handcuffs and proper establishment of probable cause. ECF No. 1 PageID.9. But Plaintiff has not produced any evidence showing that the City of Dearborn Heights ignored a history of abuse with respect to these topics. In addition, both Officer Derwick and Officer Dottor indicated that they had received training at the police academy conducted by Wayne County on the relevant topics. ECF No. 29-4; ECF No. 29-5. On its own, receiving training from Wayne County rather than Dearborn Heights cannot establish a municipal liability claim for failure to train. While the Court takes all reasonable inferences in favor of Plaintiff, Plaintiff still bears the burden of proof. Based on the facts presented in this case, no reasonable jury could find in

Plaintiff's favor on her failure to train claim against the City of Dearborn Heights.

### ii. Failure to supervise

Claims of inadequate supervision must meet the same deliberative indifference standard as claims of failure to train. *See Amerson v. Waterford Township*, 562 Fed. Appx. 484, 492 (6th Cir. 2014) ("However characterized, a claim for failure to supervise must meet the rigorous standards of culpability and causation that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its facially lawful policies." (quoting *Mize v. Tedford*, 375 Fed. Appx. 497, 500 (6th Cir. 2010))).

Plaintiff relies on an unpublished opinion from the Southern District of Ohio, *Kammeyer v. City of Sharonville, Ohio*, No. 01-00649, WL 1133241 (S.D. Ohio Apr. 27, 2006), to support its claim that failure to conduct performance evaluations forms the basis for a municipal liability claim. ECF No. 29 PageID.317. But *Amerson* specifically rejects that failure to review performance, without more, establishes a constitutional claim against a municipality. 562 Fed. Appx. at 492 ("While plaintiffs may successfully bring claims against municipalities for failure to supervise where they do not conduct reviews or monitor the performance of their employees,

plaintiffs must also show that the municipality lacks such a process our of deliberate indifference for the constitutional violations that may occur as a result.") (noting that, in *Kammeyer*, the evidence supported a finding of deliberate indifference).

Plaintiff has not produced any evidence that supports a finding that Defendant Dearborn Heights failed to conduct performance reviews out of deliberate indifference. That is, she has not shown that Dearborn Heights specifically made a choice not to conduct performance evaluations with the knowledge that such a choice would lead to constitutional violations. Consequently, Defendant Dearborn Heights is entitled to summary judgment on this issue.

## V.    Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED** in part (as to Counts I, II, and IV) and **DENIED** in part (as to Count III).

**SO ORDERED.**

Dated:  January 28, 2019   s/Terrence G. Berg
                           TERRENCE G. BERG
                           UNITED STATES DISTRICT JUDGE

**Certificate of Service**

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on January 28, 2019.

s/A. Chubb
Case Manager